UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| CITY OF WARREN GENERAL RETIREMENT HEALTH, LIFE AND DISABILITY BENEFITS PLAN AND TRUST, on Behalf of Itself and All Others Similarly Situated, | ) ) ) ) ) ) | Civ. No. <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| PENTAIR PLC, JOHN L. STAUCH, NICHOLAS J. BRAZIS, and ROBERT P. FISHMAN, | ) ) ) ) ) | |
| Defendants. | ) ) | <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff City of Warren General Retirement Health, Life and Disability Benefits Plan and Trust ("plaintiff"), on behalf of itself and all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of Pentair plc ("Pentair" or the "Company"), the Company's press releases, analyst reports, media reports, and other publicly disclosed information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of Pentair ordinary shares between March 11, 2025 and July 14, 2026, both dates inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act") against Pentair and certain of the Company's executive officers.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

- 1 -

3. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), and §27 of the 1934 Act, because certain of the events or omissions giving rise to the claim occurred in this District, including the dissemination of the statements alleged to be materially false and misleading into and from this District, certain of the defendants reside in this District, and Pentair maintains its United States headquarters in this District.

4. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

5. Plaintiff City of Warren General Retirement Health, Life and Disability Benefits Plan and Trust, as set forth in the certification attached hereto and incorporated by reference herein, purchased Pentair ordinary shares during the Class Period and has been damaged thereby.

6. Defendant Pentair is a global manufacturer of water solution products. Pentair ordinary shares are traded on the New York Stock Exchange ("NYSE") under the ticker symbol "PNR."

7. Defendant John L. Stauch ("Stauch") has served as Pentair's President and Chief Executive Officer ("CEO") and on Pentair's Board of Directors (the "Board") since 2018. Prior to serving as CEO, defendant Stauch served as Pentair's Chief Financial Officer ("CFO").

8.      Defendant Nicholas J. Brazis ("Brazis") served as Pentair's Executive Vice President ("EVP") and CFO from March 2026 until his departure from the Company in July 2026.    Defendant Brazis joined Pentair in 2023 as Vice President, Corporate Development.    Beginning in 2024, defendant Brazis served as the Company's Vice President, Corporate Development, and Treasury.    In addition, defendant Brazis served as Pentair's Senior Vice President of Finance from November 2025 until March 2026.

9.      Defendant Robert P. Fishman ("Fishman") has served as Pentair's Interim CFO following defendant Brazis' departure from the Company in July 2026.    Prior to serving as Interim CFO, defendant Fishman served as Pentair's EVP and CFO from 2020 until March 2026.

10.      Defendants Stauch, Brazis, and Fishman are collectively referred to herein as the "Individual Defendants."

11.      Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, customers, and present and future business prospects, as alleged herein.    In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

12. As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and trade on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, customers, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Pentair ordinary shares would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

**BACKGROUND**

14.   Pentair is a global manufacturer of water solution products used in residential, commercial, and industrial applications. Pentair manufacturers and sells a range of products that include, among other things, pumps, filtration devices, water treatment solutions, and pressure tanks. Pentair's customers have historically included wholesale and retail distributors, dealers, and end users.

15.   Pentair's operations are comprised of three segments: (1) Pool; (2) Flow; and (3) Water Solutions. Two of the most important financial metrics tracked by Pentair investors are segment income and return on sales ("ROS"). Segment income represents the operating income for the reported business segment exclusive of unusual non-operating items such as impairments or acquisition-related expenses. ROS is reported as a percentage and is a ratio comparing segment income to net sales. A high ROS is viewed favorably by investors as an indicator of high operating profit margins.

16.   The Pool segment, which consists of chlorinators, pumps, and other pool equipment, is Pentair's largest and most profitable business segment. In fiscal year 2025, Pentair's Pool business generated approximately $527 million in segment income, representing more than 46% of the Company's total segment income for the year. The Pool segment also has the highest reported ROS. For fiscal 2025, Pentair reported Pool segment ROS of 33.8%. By comparison, the Flow and Water Solution segments had ROS of 23.3% and 23.9%, respectively.

17.   On March 6, 2024, during its 2024 Investor Day, Pentair announced plans to significantly alter its sales operations by implementing a so-called "80/20" sales program.

According to Pentair, the program was designed to enhance earnings by prioritizing sales of the Company's highest margin products to the Company's most profitable customers. Pentair has claimed the program would: "Accelerat[e] Value Creation by Focusing on the Right Customers and Products." Pentair has also described its "80/20 Guiding Principles," by which its 80/20 sales strategy would ostensibly "reduce complexity and increase revenue, income, and the customer experience."

18. For its 80/20 framework, Pentair implemented a quadrant-based strategy whereby the Company segmented its customers and products into four categories: (1) quadrant one contained sales of the Company's most valuable products to its most valuable customers; (2) quadrant two contained sales of the Company's lower value products to its most valuable customers; (3) quadrant three contained sales of the Company's most valuable products to the Company's lower value customers; and (4) quadrant four contained sales of the Company's lower value products to its lower value customers.

19. As depicted in the following slide shown during Pentair's investor presentation, the Company intended to "[k]eep" sales in quadrant one, "[m]igrate" away from low-value product sales in quadrant two to the higher value products sold in quadrant one, implement "[t]ransactional" changes to funnel high-value product sales in quadrant three to high-value customers in quadrant one, and "[o]ptimize" or discontinue sales in quadrant four:



20.    Pentair's 80/20 program required the Company to significantly overhaul its sales operations.  Notably, the concentration of sales within quadrant one required the Company to disturb longstanding customer relationships.  For example, as defendant Stauch explained during a September 2024 conference call, the migration of sales from quadrant two to quadrant one required Pentair to sell products to customers that were more valuable from Pentair's perspective that those customers "don't really want to buy." Similarly, the consolidation of quadrant three sales – which were largely comprised of Pentair's "loyal dealers" – into quadrant one required the Company to discontinue longstanding discounting practices in order to encourage those customers to purchase directly from Pentair's larger and more valuable distribution partners populating quadrant one.  And, the Company employed "strategic pricing" by increasing prices to cull certain undesirable products out of its portfolio or to encourage clients to move out of lower quadrants.

21. The size and scale of Pentair's product offerings further complicated the implementation of the 80/20 program. Pentair's planned quadrant-based strategy required the Company to carefully assess thousands of products across the Company's three business segments. For example, Pentair's Pool business alone contained more than 8,000 unique items that would need to be accurately categorized within the Company's 80/20 framework.

22. During the Class Period, Pentair represented that it had successfully implemented its 80/20 program and claimed the initiative was benefitting the Company. For example, speaking during an October 2025 earnings call with investors, defendant Stauch claimed that Pentair's 80/20 program was "show[ing] early signs of success" and "creating a flywheel for continued sales growth and profitability." Defendant Fishman similarly represented that the Company's 80/20 actions were "really beginning to read out," including by providing a "large funnel" of business opportunities. Defendant Stauch further represented that Pentair had successfully discontinued business with its "lesser customers" under its 80/20 program and was now growing alongside its core customers, proclaiming, "that's the stage we're at in some of our businesses."

23. Defendants continued to highlight the purported benefits of Pentair's 80/20 program throughout the Class Period. For example, in connection with Pentair's February 2026 earnings announcement, defendant Stauch represented that he expected the Company to "'deliver another year of sales and earnings growth and margin expansion,'" including by leveraging Pentair's 80/20 playbook. During the related earnings call, defendant Stauch claimed that Pentair's 80/20 program was "gaining traction" and "deepen[ing]

- 8 -

relationships" with customers, which he claimed had driven "higher efficiency and growth." Defendant Brazis similarly represented that he expected the 80/20 program to "drive growth across our balanced portfolio," including the Pool segment.

24. However, unbeknownst to investors, Pentair's 80/20 program had caused widespread customer dissatisfaction, eroded longstanding commercial relationships, and alienated some of its most loyal customers, particularly within the Pool segment. Contrary to defendants' Class Period representations that the program had "deepen[ed]" customer relationships, the 80/20 initiative had, in fact, pushed many of Pentair's Pool customers to leave the Company for competitors, resulting in significant market share losses. The Company's hyper focus on quadrant one initially – but temporarily and unsustainably – boosted key operating metrics within the Pool segment as it took time for dissatisfied customers to find alternative suppliers.

25. Rather than disclose these adverse trends, defendants covered up the erosion of Pentair's customer base. Specifically, defendants concealed the fact that Pentair's customers had received rebates at rates far above historical norms, which had incentivized remaining Pool customers to purchase inventory in excess of their current needs, thereby cannibalizing the Company's future sales. In addition, defendants failed to disclose that as a result of the 80/20 program certain of Pentair's Pool customers had begun purchasing inventory in advance of anticipated price increases, temporarily inflating revenues at the expense of future periods. As a result, Pentair was acutely exposed to a material undisclosed risk of significant operational and financial harm as a result of its ill-fated 80/20 program.

26.     Then, on February 3, 2026, Pentair reported fourth quarter 2025 earnings results, revealing that total net sales growth was on track to slow to a range of 1% to 2% in the first quarter of 2026, missing consensus estimates by tens of millions of dollars.  During the related earnings call, Pentair further revealed that net sales growth had all but ceased in its critical Pool segment and that multiple executives would be abruptly leaving the Company, including most notably Steve Pilla ("Pilla"), the Company's Chief Supply Officer, Chief Transformation Officer, and the leader of the 80/20 initiative.

27.     Despite these disclosures, defendants continued to conceal the truth regarding the impact of Pentair's 80/20 program and the health of its Pool segment.  For example, during Pentair's February 2026 earnings call, defendant Stauch assured investors that the 80/20 program had presented "no headwind" to the Company, stating that, to the contrary, "going forward" the Company expected its top customers to "bear fruit and drive revenue higher" as a result of the sales changes.  Similarly, in March 2026 during Pentair's Investor Day, defendant Stauch dismissed claims that the Pool business was ceding market share to competitors, stating that Pool was "still in the leading position."

28.     Then, on April 28, 2026, Pentair reported its financial results for the first quarter of 2026, revealing that the Company was slashing its 2026 net sales guidance for the Pool segment from expected growth of 3% to a range of just 1% to 3%.  During the related earnings call, defendant Brazis admitted that the abrupt guidance cut reflected the need of Pentair's Pool channel partners to "reduce purchases in Q2 and Q3" as a result of disappointing "sell-through dynamics" during the first quarter.  During the call, a Jefferies analyst asked for additional information regarding the sudden deterioration in the Pool

- 10 -

business, expressing "surprise[]" at the sudden step down in sales given the "strong [] buys" by other channel participants.  In response, defendant Stauch stated that customer sell-through activity did not "warrant a big pickup in the sell-in activity," which he noted would result in "lower shipments" over the next two quarters.  Defendant Stauch further revealed that, "to get ahead of those price increases," Pentair's Pool customers had "bought ahead" in excess of their current needs, a practice he said "we don't think will continue."  That same day, Pentair announced that its Executive Vice President and CEO of Pool Jerome Pedretti was resigning.

29.    On July 14, 2026, Pentair reported its preliminary earnings results for the second fiscal quarter of 2026, revealing that the Pool segment net sales had collapsed due to efforts by customers to "right siz[e]" channel inventory.  The Company estimated that customer destocking efforts had reduced Pool segment net sales in the quarter by approximately $170 million, implying Pool net sales had declined by ***more than 40% year-over-year***.  Largely as a result of the Pool segment, total Company net sales suffered a 17% year-over-year decline during the quarter.  Pentair further revealed that net sales for the Company were expected to turn ***negative*** for the year, falling from expected growth of positive 2% to 4% to negative 4% to 7% growth.  Pentair also disclosed that defendant Brazis had resigned only four months after being appointed CFO.

30.    In the days following Pentair's earnings announcement, multiple analysts published reports discussing the reasons underlying the sudden and dramatic deterioration in Pentair's Pool business.  For example, analysts at Northcoast Research reported that during a May 2026 meeting, defendant Brazis admitted that Pentair's 80/20 program had

- 11 -

"c[o]me at the cost of alienating some channel partners, particularly in Pool." The analysts further noted that, while defendant Brazis had "downplayed market share concerns" in their meeting, Pentair's "stunning" preannouncement "raise[d] fresh competitive concerns." Analysts at BofA Securities similarly reported, based on their independent channel checks, that "dealers were dissatisfied with PNR's 80/20 changes," which they blamed as "may be leading to market share loss."

31.     On July 28, 2026, Pentair reported the Company's final earnings results for its second fiscal quarter of 2026. During the related conference call, an analyst from RBC Capital Markets asked whether there had been any "fallout" from Pentair's 80/20 program in the Pool segment. In response, defendant Stauch belatedly admitted that Pentair had experienced significant problems as a result of its 80/20 program, bluntly conceding, "[t]he answer, Dean[e], is yes." Defendant Stauch elaborated that Pentair had failed to "implement [80/20] with the right assumptions," which "create[d] disruptions and some of the lost share that we had alluded to in the aftermarket side of our business." Defendant Stauch further acknowledged that Pentair had "made some decisions that need to be reversed."

32.     Later during the call, defendant Stauch revealed that the Company's price increases had created a "prebuy energy level across the entire channel" as customers sought "to get ahead of those price increases," resulting in excess channel inventory. An analyst from Stifel, Nicolaus & Company noted that, "it doesn't seem like a lot of the other suppliers are seeing the destocking at least to the same level that Pentair is," and asked for "more color" on how the excess inventory had entered the channel. In response, defendant

Stauch disclosed that excess inventory had built up beyond normal levels due to a "fair amount of rebates . . . and encouragement of dealers to buy product," which had caused inventory to be "pull[ed] ahead . . . from Q2 into Q1."

33. As a result of the disclosures detailed herein, the price of Pentair ordinary shares declined more than 40% from Class Period highs of roughly $112 per share to less than $65 per share after the truth was revealed to the market, causing investors to suffer substantial financial losses and economic damages under the federal securities laws.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

34. The Class Period begins on March 11, 2025. On that date, defendant Stauch represented Pentair at the JP Morgan Industrials Conference. When asked about where the Company was in its "transformation," defendant Stauch highlighted the purported success of the 80/20 program, stating:[1]

> So as we have implemented 80/20 across our portfolio, *we're getting the savings associated with repositioning the portfolio, and it's making up for a little bit of that volume leverage*. And I want to throw that out there because that builds confidence in us that once we get these business models established and performing well, when we get the growth back, which we do believe we will, *we're going to leverage at a very high value going forward*.

35. On April 22, 2025, Pentair issued a press release reporting the Company's financial results for its first fiscal quarter ending March 31, 2025 ("1Q25 Release"). The 1Q25 Release stated that Pentair's Pool net sales had increased 7% year-over-year to $384 million compared to $360 million in the prior year quarter. The 1Q25 Release further stated that Pool segment income increased 14% year-over-year to $126 million compared

---

[1] Emphasis added here and throughout unless otherwise stated.

- 13 -

to $111 million in the prior year quarter. In addition, the 1Q25 Release stated that Pool ROS increased in the quarter to 32.8% compared to 30.8% in the prior year quarter. The 1Q25 Release quoted defendant Stauch who highlighted Pentair's "continued execution and agility," which he claimed included the Company's "80/20 actions."

36.     That same day, Pentair hosted a conference call with analysts and investors to discuss the Company's first quarter results, which was hosted by defendants Stauch and Fishman. During his prepared remarks, defendant Stauch emphasized the 80/20 actions Pentair had undertaken during the quarter and portrayed the program as an "enabler" that would allow the Company to "become a larger and more profitable business," stating:

> As we continue to implement 80/20, we expect to drive high-value core sales growth long term by over serving our best customers and optimizing the rest. *We have taken actions to transition our Quad 3 and 4 lower-margin customers to purchase directly from our top distributors or except new terms and conditions that we expect to enable us to become a larger and more profitable business*.
>
> *We are also optimizing the selection of products we offer to reduce complexity within our operations and advance productivity. Additionally, 80/20 actions have helped us to absorb higher inflationary costs. We see 80/20 as an enabler to transformation by reducing complexity and streamlining our businesses*.

37.     During the call, an analyst asked whether there was any "demand destruction" in the Pool channel as a result of tariff-related price increases. In response, defendant Stauch pointed to Pentair's 80/20 program, claiming that the program had "been a great tool" allowing the Company to only ship to a "handful of key distributors," stating:

> Not yet, Steve. I think we're well positioned to – I mean, *80/20 has been a great tool for us*. Keep in mind, we're really only shipping to a handful of key distributors now directly as part of the 80/20 effort. And so it's a lot less channel partners that we have to work through. And I think in – from our perspective, we think all of them think they're being treated fairly.

- 14 -

38.    Also on April 22, 2025, Pentair filed its quarterly report on Form 10-Q with the SEC, which was signed by defendant Fishman.  Defendants Stauch and Fishman also provided certifications attesting to the report's accuracy and completeness.  The quarterly report contained the same financial information regarding net sales, income, and ROS in the Company's Pool segment as stated in the 1Q25 Release.  The quarterly report also highlighted the Company's 80/20 program, stating:

> During 2024 and the first three months of 2025, we implemented 80/20 guiding principles to enable our Transformation Program. ***This 80/20 analysis is expected to create value by focusing on key customers and products through quadrant-based strategies.  We expect the analysis to result in actions to improve operating performance by driving growth with our highest value customers, reducing lower margin sales and removing complexity in the future***.

39.    On July 22, 2025, Pentair issued a press release reporting the Company's financial results for its second fiscal quarter ending June 30, 2025 ("2Q25 Release").  The 2Q25 Release stated that Pentair's Pool net sales had increased 9% year-over-year to $427 million compared to $392 million in the prior year quarter.  The 2Q25 Release further stated that the Pool segment income increased 14% year-over-year to $153 million compared to $134 million in the prior year quarter.  In addition, the 2Q25 Release stated that Pool ROS increased in the quarter to 35.7% compared to 34.1% in the prior year quarter.  The 2Q25 Release quoted defendant Stauch who represented that Pentair's 80/20 actions were "showing early signs of success."

40.    That same day, Pentair held a conference call with analysts and investors to discuss the Company's second quarter results, which was hosted by defendants Stauch and

- 15 -

Fishman.  During the call, defendant Stauch emphasized Pentair's implementation of its 80/20 program, which he claimed would result in "continued margin opportunity," stating:

> ***We remain on track to deliver our expected transformation savings this year, and we expect continued margin opportunity beyond 2026, as we accelerate the implementation of 80/20 and [sic] the transformation progress continues***.

41.     Also on July 22, 2025, Pentair filed its quarterly report on Form 10-Q with the SEC, which was signed by defendant Fishman.  Defendants Stauch and Fishman also provided certifications attesting to the report's accuracy and completeness.  The quarterly report contained the same financial information regarding net sales, income, and ROS in the Company's Pool segment as stated in the 2Q25 Release.  The quarterly report also highlighted the Company's 80/20 program, stating:

> During 2024 and the first six months of 2025, we implemented 80/20 guiding principles to enable our Transformation Program.  ***This 80/20 analysis is expected to create value by focusing on key customers and products through quadrant-based strategies.  We expect the analysis to result in actions to improve operating performance by driving growth with our highest value customers, reducing lower margin sales and removing complexity in the future***.

42.     On October 21, 2025, Pentair issued a press release reporting the Company's financial results for its third fiscal quarter ending September 30, 2025 ("3Q25 Release").  The 3Q25 Release stated that Pentair's Pool net sales had increased 7% year-over-year to $354 million compared to $331 million in the prior year quarter.  The 3Q25 Release further stated that Pool segment income increased 3% year-over-year to $116 million compared to $113 million in the prior year quarter.  In addition, the 3Q25 Release reported Pool ROS of 32.8%.  The 3Q25 Release quoted defendant Stauch who stated that Pentair was "leveraging" the Company's 80/20 program to "drive top-line growth."

43.     That same day, Pentair held a conference call with analysts and investors to discuss the Company's third quarter results, which was hosted by defendants Stauch and Fishman.  During his prepared remarks, defendant Stauch emphasized Pentair's 80/20 actions, which he represented were "show[ing] early signs of success."  Defendant Stauch added that Pentair's 80/20 program was "creating a flywheel for continued sales growth and profitability."

44.     During the call, a Barclays analyst asked about Pentair's revenue outlook for fiscal 2026.  In response, defendant Fishman stated he was "pleased" that Pentair's focus on its quadrant one customers under the 80/20 program was "really beginning to read out" and that the Company would end the year "with a large funnel" of opportunities, stating:

> *I'm also really pleased that the 80/20 focus on our Quad 1 customers and over serving those customers is really beginning to read out.  We'll have transformation momentum ending the year with a large funnel*.

45.     Defendant Stauch added to these comments, representing that Pentair was successfully implementing its 80/20 program, including by moving away from "lesser performing customers" in favor of achieving "double-digit growth [from] core customers," stating:

> And so by deemphasizing the Quad 4 or [the lesser] customers today, you have an opportunity to go back to those top customers and say, how do we grow together and really think of our partnership that we have built together.  So that's what we're talking about.  And it's a leap of faith to say, I'm going to give away my growth to the lesser performing customers, and I'm going to get that double-digit growth for my core customers.
>
> *But when you start to see it, you start to build momentum and then you build more programs with those individuals to be more successful.  And that's the stage we're at in some of our businesses, and that's building momentum and best case examples that we share across the rest of the portfolio*.

- 17 -

46. A Citigroup analyst also asked about the performance of Pentair's 80/20 program in 2026. In response, defendant Fishman represented he was "very comfortable" with how the program was impacting the Company's 2026 results, stating:

> ***Very comfortable with the '26, let's start there, and very comfortable that when we come to Investor Day, we'll demonstrate a bundle that significantly improves from there***.

47. Also on October 21, 2025, Pentair filed its quarterly report on Form 10-Q with the SEC, which was signed by defendant Fishman. Defendants Stauch and Fishman also provided certifications attesting to the report's accuracy and completeness. The quarterly report contained the same financial information regarding net sales, income, and ROS in the Company's Pool segment as stated in the 3Q25 Release. The quarterly report also highlighted the Company's 80/20 program, stating:

> During 2024 and the first nine months of 2025, we implemented 80/20 guiding principles to enable our Transformation Program. ***This 80/20 analysis is expected to create value by focusing on key customers and products through quadrant-based strategies. We expect the analysis to result in actions to improve operating performance by driving growth with our highest value customers, reducing lower margin sales and removing complexity in the future***.

48. The statements referenced in ¶¶34-47 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as follows:

(a) that Pentair's 80/20 program had failed to improve the Company's business and operations and had instead materially impaired Pentair's longstanding

commercial relationships, alienated its customers, and created widespread customer dissatisfaction, particularly within the Company's Pool segment;

(b)     that Pentair was losing business and market share, as a significant portion of its Pool customers had turned to competitors in response to Pentair's 80/20 program initiatives, which had more than offset any purported benefits to the Company's business and financial results as a result of the implementation of the 80/20 program;

(c)     that Pentair's implementation of the 80/20 program had caused certain of its remaining Pool customers to buy inventory in excess of their current needs in advance of future price increases, cannibalizing the Company's future sales;

(d)     that Pentair's remaining Pool customers had received rebates at rates above historical norms, which had artificially inflated the Company's sales and revenue in the short-term at the expense of future periods; and

(e)     That as a result of (a)-(d) above, Pentair was acutely exposed to material, undisclosed risks of significant financial and operational harms as a result of the Company's implementation of its 80/20 program.

49.     Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" in its periodic quarterly and annual financial reports filed with the SEC.  Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of these reports, "a discussion of the material factors that make an investment in the registrant or

- 19 -

offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

50.     Under Item 303, given the central importance of Pentair's 80/20 program to the Company's purported "transformation," business and operations, Pentair's periodic reports were required to describe the known trends and uncertainties relating to the problems that had arisen from the program's implementation.  Similarly, under Item 105, these adverse facts should have been disclosed because they created significant risks that made an investment in Pentair ordinary shares speculative and risky, but were not.  Indeed, the boilerplate risk discussions provided in the Company's SEC filings were *themselves* materially misleading because they provided generic statements of potential or contingent risk, yet failed to disclose the adverse events that had *already* transpired and therefore had already negatively impacted the Company's business and operations.  For example, the "Risk Factors" section of the Company's fiscal 2025 annual report stated that Pentair "*may* not be able to achieve accelerated growth or ongoing margin expansion and operating efficiencies to reduce costs" when in fact problems stemming from the Company's 80/20 program had *already* negatively impacted the Company's business and operations, particularly within the Company's Pool segment.

51.     Then, on February 3, 2026, Pentair announced the Company's earnings results for its fourth fiscal quarter and full year ending December 31, 2025 ("4Q25 Release").  The release revealed that Pentair's net sales were on track to grow only 1% to 2% for its first fiscal quarter of 2026, missing analyst consensus estimates by tens of millions of dollars.  During the related earnings call, Pentair disclosed that net sales growth

in its critical Pool business had flatlined. Pentair concurrently announced that the Company's Chief Transformation Officer & Chief Supply Officer, Steve Pilla, was abruptly departing and that the Chief Transformation position was being eliminated. Notably, Mr. Pilla had led Pentair's efforts to implement the 80/20 program.

52. In the wake of these revelations, TD Cowen analysts characterized Pentair's first quarter net sales guidance as "weak" and described the Company's decision to eliminate its Chief Transformation position as "unexpected." Similarly, Oppenheimer analysts described Pentair's Pool segment guidance as the primary "callout/pushback from investors," prompting "[r]enewed Pool [f]ears."

53. On this news, the price of Pentair ordinary shares fell from $105.51 per share on February 2, 2026 to $94.79 per share on February 3, 2026, a decline of more than 10% on above-average trading volume. However, the price of Pentair ordinary shares remained artificially inflated, as defendants continued to make materially false and misleading statements and failed to disclose the full truth to investors.

54. For example, the 4Q25 Release stated that Pentair's Pool net sales had increased 11% year-over-year during the fourth quarter to $393 million compared to $354 million in the prior year quarter. The 4Q25 Release further stated that the Pool segment income increased 11% year-over-year to $132 million compared to $119 million in the prior year quarter. In addition, the 4Q25 Release reported Pool ROS of 33.6 %. The 4Q25 Release also stated that Pentair expected total annual net sales to grow in the range of 3% to 4%. The 4Q25 Release quoted defendant Stauch, who emphasized Pentair's 80/20

program and represented that Pentair was on track to "'deliver another year of sales and earnings growth,'" stating:

> "*We expect 2026 to deliver another year of sales and earnings growth and margin expansion as we leverage our Pentair Business System tools, including Transformation and 80/20, and continue to actively manage our balanced and resilient water portfolio*."

55.    During the related fourth quarter earnings call, defendant Stauch represented that Pentair's 80/20 program was "gaining traction" and "deepen[ing] relationships" with the Company's customers, which he claimed had resulted in "higher efficiency and growth":

> *And 80s, 20s is gaining traction, allowing us to deepen relationships with our largest customers, our 80s, while streamlining our portfolio for the higher efficiency and growth by reducing our efforts on the 20s*.

56.    Defendant Brazis (who had recently replaced defendant Fishman as CFO) echoed these remarks, stating he expected the 80/20 program to "drive growth across our balanced portfolio," including in the Company's Pool segment.

57.    When an analyst from Stifel Nicolaus & Company inquired whether there had been any "headwinds" caused by Pentair's 80/20 actions, defendant Stauch responded unequivocally "[n]o" and assured investors that any early business losses were "behind us" clearing the way for "higher level" growth:

> *No headwind.  All of those early, let's allow businesses to walk away from Quad four revenue are behind us.  And what we have going forward is what should be a higher level of growing the 80s*, which is the Quad one and the top customers we have, and *we would expect those relationships to bear fruit and drive revenue higher in the upcoming next several years*.

58.    When a Barclays analyst asked about the cadence of Pentair's financial guidance throughout the year, defendant Brazis represented that Pool volumes were

- 22 -

expected to begin "read[ing] out" in the second quarter as a result of a "series of investments" the Company had made, stating:

> Yes, you're spot on with the comp and the comment around some decremental volume in the first part of the year with incremental volume in the back half of the year, which leads to the flat full year volume. ***There's been a series of investments in several of our businesses to help drive some of that incremental growth in the back half of the year***. And ***we think that's going to start to read out in pool in Q2*** and then in our commercial water businesses in Q2 and through the rest of the year. ***So spot on, on the growth in the back half for volume versus the first half***.

59. When pressed about the Company's "flattish guidance," defendant Stauch blamed macroeconomic conditions, stating that Pentair was "still waiting for the markets to recover."

60. Defendant Brazis similarly pointed to macroeconomic conditions like the "weather" and "tariffs," but claimed the guide was simply "pragmatic":

> Yeah. I'll just add, when you look at sell-in for Q4, it's up a little bit relative to sellout, which we believe balances in Q1. And then we see volume up Q2 through Q4 for flat volume for pool in our guide for the year. And we think we're being pragmatic with this guide. ***When you look at weather patterns in Q1, some of the freezes in the South, tariffs driving some buying patterns, we think that it's a pragmatic guide we're, again, as John said, we're just not assuming a change in residential recovery in 2026***.

61. On February 24, 2026, Pentair filed its annual report on Form 10-K with the SEC, which was signed by defendants Stauch and Fishman. Defendants Stauch and Fishman also provided certifications attesting to the report's accuracy and completeness. The annual report contained the same financial information regarding net sales, income, and ROS in the Company's Pool segment as stated in the 4Q25 Release. The annual report also highlighted the Company's 80/20 program, stating:

- 23 -

In 2025, we implemented 80/20 guiding principles to enable our Transformation Program. *As we continue to focus on 80/20 principles in 2026, we expect to create value by increasing focus on key customers and products through quadrant-based strategies. This approach will enable improved operating performance by driving margin growth with our highest value customers, reducing lower margin sales and removing complexity in the future*.

62.    On March 4, 2026, Pentair held a conference call with investors at its Investor Day, which was hosted by the Company's executive leadership team, including defendants Stauch and Brazis. During his prepared remarks, defendant Stauch represented that he expected growth from Pentair's 80/20 actions to "readout" in fiscal 2026, stating:

All we need is a flattening of that growth profile, which we think we'll see in '26. *And you'll start to see the Quad 1 efforts of 80/20 readout, but you'll also see the benefits from innovation and the hard work we've done to make sure that our dealers get the type of service and elite treatment that they deserve*.

63.    Defendant Stauch also dispelled industry "rumors" of share loss, stating that Pentair's Pool business was "still in the leading position."

64.    Defendant Brazis similarly highlighted Pentair's 80/20 actions, representing that the Company had executed customer exits with "discipline and focus" and "freed up . . . capacity" for the Company's priority customers, stating:

Foremost, you've heard us regularly talk about 80/20. 80/20 has become a way of life at Pentair. *SKU rationalization and 80/20 focus have reduced complexity and freed up some of our capacity to prioritize our Quad 1 customers: our priority customers*.

*We've executed with discipline and focus to complete our Quad 4 exits*. Our 80/20 journey is continuing, with our key ratio guiding our focus.

65.    Defendant Brazis continued by representing that Pentair's 80/20 program was "advancing" its Pool business, including by improving sales, inventory management, and "forecast accuracy":

- 24 -

We're taking our Quad 1 customers, with initial focus on commercial water and pool; and advancing the tools of sales, inventory, and operational planning. ***These efforts are going to provide an enhanced customer experience for our Quad 1 customers, while also increasing our forecast accuracy; reducing future excess and obsolesced inventory; improving inventory turns; and, ultimately, improving our free cash flow from operations***.

66. The statements referenced in ¶¶54-65 above were materially false and/or misleading when made because they failed to disclose the adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them for the reasons set forth in ¶48.

67. Then, on April 28, 2026, Pentair announced results for its first fiscal quarter ending March 31, 2026 ("1Q26 Release"), revealing that the Company had cut its annual net sales guidance for Pool to a range of 1% to 3% net sales growth. During the related earnings call, defendant Brazis further revealed that the downward revision reflected the need of channel partners to "reduce purchases in Q2 and Q3" in light of "sell-through dynamics" experienced in the first quarter, stating:

And pool sales are expected to increase approximately 1% to 3% in 2026. While we're encouraged by sell-through dynamics in Q1, sell-through levels for this pool season, which concludes in Q3 of 2026, may require our channel partners to reduce purchases in Q2 and Q3 to reflect 2026 pool industry growth.

Therefore, we evaluated a wider range of pool revenue and income scenarios. And we have incorporated these assumptions and scenarios into our guidance update.

68. During the call, analysts questioned the sudden deterioration in Pentair's Pool segment. For example, a Jefferies analyst noted he was "surprised" by the weak Pool guidance given the "strong . . . buys" by other channel participants. In response, defendant

Stauch stated that current sell-through activity did not "warrant a big pick up in the sell-in activity," leading to "lower shipments" in the second and third quarters. Defendant Stauch further revealed that, to "get ahead" of price increases, Pentair's Pool customers had "bought ahead," cannibalizing future periods.

69.     In the wake of these revelations, multiple analysts focused on the sudden decline in Pentair's Pool business. For example, in a published report, analysts at RBC Capital Markets described Pentair's Pool business as the "[b]iggest surprise" while also stating that the "new/unexpected warning of a potential 2Q/3Q Pool 'destock'" had "overshadowed" other results and "sen[t] shares down -10%." Similarly, analysts at BofA Securities stated that the price of Pentair ordinary shares had declined "due to muted pool results/outlook vs. investor expectations" and described Pool guidance as "disappoint[ing]."

70.     On this news, the price of Pentair ordinary shares fell from $92.27 per share on April 27, 2026 to $80.84 per share on April 29, 2026, a decline of more than 12% over a two-day trading period on above-average trading volume. However, the price of Pentair ordinary shares remained artificially inflated, as defendants continued to make materially false and misleading statements and failed to disclose the full truth to investors.

71.     For example, the 1Q26 Release stated that Pentair's Pool net sales had increased 1% year-over-year to $387 million compared to $383 million in the prior year quarter. The 1Q26 Release further stated that Pool segment income increased 2% year-over-year to $128 million compared to $126 million in the prior year quarter. In addition,

- 26 -

the 1Q26 Release reported Pool ROS of 33.1% and stated that Pentair was on track to achieve total net sales growth of 2% to 4%.

72.    During the first quarter earnings call held that same day, a Jefferies analyst asked Pentair management about the Company's market share within the Pool segment.  In response, defendant Stauch stated that the Company "fel[t] good about [its] positions," stating:

> Yes, *we feel good about our positions*.  I mean I think what we're seeing in the dynamics is we have high-end premium pools, we have midrange goals and remodeling and then you ultimately have the aftermarket. And the challenge is that we're just not seeing overall volume growth across that pool industry as a whole.
>
> And what you're seeing is a series of defeaturing that's happening in the aftermarket or pushouts from consumer discretionary.  But overall, *I think we're looking at overall volume flat on the sell-through side and taken a lot of activity and energy to achieve that*.  But ultimately, we're hanging in there in what I would say is a flattish market.

73.    Defendant Brazis similarly represented that Pentair's assumption for the Pool outlook was "[f]lattish on volume, plus price."

74.    In addition, defendant Stauch assured investors that the excess sell-in within the Pool channel was "appropriately" reflected in the Company's financial guidance, stating:

> And then you have to think about our sell-in and that should be equal to sell-through over time.  But what we have been clear about is that our sell-in outpaced our sell-through at the end of last year, probably in anticipation of what the '26 full year would look like and also people trying to get ahead of incremental tariff and pricing, and that needs to come back in line, *which is why we're adjusting Q2 and Q3 appropriately*.

75.    Also on April 28, 2026, Pentair filed its quarterly report on Form 10-Q with the SEC, which was signed by defendant Brazis.  Defendants Stauch and Brazis also

- 27 -

provided certifications attesting to the report's accuracy and completeness. The quarterly report contained the same financial information regarding net sales, income, and ROS in the Company's Pool segment as stated in the 1Q26 Release. The quarterly report also highlighted the Company's 80/20 program, stating:

> During 2025 and the first three months of 2026, we implemented 80/20 guiding principles to enable our Transformation Program. *As we continue to focus on 80/20 guiding principles in 2026, we expect to create value by increasing focus on key customers and products through quadrant-based strategies. We expect this approach to enable improved operating performance by driving margin growth with our highest value customers, reducing lower margin sales and removing complexity in the future*.

76. The statements referenced in ¶¶71-75 above were materially false and/or misleading when made because they failed to disclose the adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them for the reasons set forth in ¶48.

77. Then, on July 14, 2026, Pentair announced preliminary earnings results for its second fiscal quarter ending June 30, 2026 ("2Q26"), revealing a significant deterioration in Pool segment sales. Pentair attributed the outsized erosion in its Pool business to a "pronounced inventory realignment with major channel partners" and efforts by customers to "right siz[e]" channel inventory. Specifically, the release stated that excess inventory destocking by Pentair customers had negatively impacted its quarterly Pool net sales by approximately $170 million, implying a 40% year-over-year segment decline. As a result, Pentair revealed that total Company net sales in the quarter had declined by 17% and that the Company was not, in fact, on track to achieve 2026 net sales *growth* of 2% to 4% as previously represented, but instead on track to suffer a 4% to 7% *decline*. Pentair

- 28 -

concurrently announced that defendant Brazis was abruptly departing the Company only four months after becoming CFO.

78.    After the quarterly results were announced, analysts lambasted Pentair's 80/20 program.  For example, Northcoast Research analysts reported that during a May 2026 meeting with Pentair management, defendant Brazis admitted that Pentair's 80/20 program had "c[o]me at the cost of alienating some channel partners, particularly in Pool." The analysts further stated that, while defendant Brazis "downplayed market share concerns," Pentair's "stunning" preannouncement would "raise fresh competitive concerns."  In addition, the analysts noted that the Company's announcements were "particularly surprising" following the "bullish outlook" that Pentair's executive management team had recently provided to investors during the Company's March 2026 Investor Day.  Analysts at BofA Securities similarly reported that "dealers were dissatisfied with PNR's 80/20 changes" according to their independent channel checks, which "may be leading to market share loss."  RBC Capital Markets analysts likewise observed that the magnitude of Pentair's "shortfall" supported a growing view that the Company's 80/20 initiative and aggressive customer refocusing had impaired the Company's business relationships, making its partners more willing to destock or move away from Pentair entirely.

79.    On this news, the price of Pentair ordinary shares fell from $75.68 per share on July 14, 2026 to $64.33 per share on July 15, 2026, a 15% decline on above-average trading volume.

- 29 -

80.     On July 28, 2026, Pentair reported its finalized 2Q26 results.  During the related conference call, an analyst from RBC Capital Markets pressed Pentair management about the "fallout" from the Company's 80/20 initiatives.  In response, defendant Stauch admitted that Pentair had failed to "implement [80/20] with the right assumptions" leading to market share loss:

> The answer, Dean, is yes.  It's not 80/20 as a tool.  It's the way you implement 80/20.  And I think we made some assumptions on some of the smaller distributors, buying groups and small dealers that are independent and don't necessarily buy from the two largest distributors.  And those actions did create disruptions and some of the lost share that we had alluded to in the aftermarket side of our business.
>
> And we are actively pursuing getting that back and reestablishing those relationships.  They're long-term relationships, and we made some decisions that need to be reversed.  And again, I won't blame that on the 80/20 tool.  I'll acknowledge that we didn't implement the tool with the right assumptions, the right industry knowledge that we should have utilized.

81.     Later in the call, defendant Stauch disclosed that the price increases Pentair had enacted in its Pool segment as a result of the 80/20 initiative had "drove a prebuy energy across the entire channel" and caused customers "to get ahead of those price increases," leading to excess channel inventory buildup and cannibalizing future sales.

82.     When an analyst noted that "it doesn't seem like a lot of the other suppliers are seeing the destocking at least to the same level that Pentair is," defendant Stauch admitted that a "fair amount of rebates" had encouraged dealers to pull forward their purchases, stating:

> What happened in Q2 is we saw that there might have been some pull ahead from the channel from Q2 into Q1 and that we also noticed that there's a fair amount of rebates to dealers and encouragement of dealers to buy product.  And we learned that we weren't going to hit those sell-through rates, which is where we started to soften the guide in the April time frame,

- 30 -

we brought – came out with a lower pool forecast, if you recall.  And we had a little bit of the inventory correction in our Q3 numbers.

And then it became apparent that we were going to be in an excess inventory situation in Q2 and we worked with the channel to actively try to rightsize everything so that we could get it all behind us by the end [of Q3] and begin to get back to a sell-out mentality next year and also just make sure that inventory coming in equals the inventory that's going to – it's that simple.  I can't speak for the competition.

These numbers get large because when you have a large business, just a little bit of percentage miss on the way up, doubles the impact on the way down.

83.     As a result of the disclosures detailed herein, the price of Pentair shares declined more than 40% from Class Period highs of roughly $112 per share to less than $65 per share by Class Period end, inflicting substantial financial losses and economic damages on plaintiff and other members of the Class.

## CLASS ACTION ALLEGATIONS

84.     Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased Pentair ordinary shares during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

85.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Pentair ordinary shares were actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of

- 31 -

the Class may be identified from records maintained by Pentair or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

86.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

87.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

88.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether defendants' statements during the Class Period were materially false and misleading;

(b)    whether defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(c)    the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

89.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of

the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## ADDITIONAL SCIENTER ALLEGATIONS

90.    As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated during the Class Period to the investing public in the name of the Company, or in their own name, were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Pentair, and their control over and/or receipt and/or modification of Pentair's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

91.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The Individual Defendants, because of their positions with Pentair, controlled the contents of Pentair's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material, nonpublic information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the

public and that the positive representations that were being made were materially false and misleading when made. As a result, each of the defendants is responsible for the accuracy of Pentair's corporate statements and is, therefore, responsible and liable for the representations contained therein.

92. Pentair's customer relationships, 80/20 program, and competitive standing were among the most important issues facing the Company and the focus of Pentair's management, including the Individual Defendants. Indeed, the 80/20 program was the central pillar of the Company's overall business "transformation" and so critical to the Company's operations during the Class Period that defendant Brazis described the initiative as a "way of life" at Pentair. The Individual Defendants, as Pentair's most senior executives and the chief managers responsible for implementing the 80/20 program, repeatedly held themselves out to the market as the persons most knowledgeable regarding Pentair's 80/20 program and its impact on the Company's business.

93. The clear contradiction between defendants' actionable statements and the material, undisclosed facts alleged herein further supports scienter. For example, when asked directly during a February 2026 conference call whether Pentair's 80/20 program was creating revenue problems, defendant Stauch unequivocally represented that there was "no headwind" and assured investors that the program would "bear fruit and drive revenue higher." Similarly, defendant Stauch later dismissed claims that Pentair's Pool business was ceding market share during the Company's March 2026 Investor Day, stating that Pool was "still in the leading position" notwithstanding industry "rumors" to the contrary. The timing of these representations, made when Pentair's 80/20 program had ***already*** deeply

damaged Pentair's customer relationships and caused a significant portion of the Company's Pool customers to abandon demonstrates an intent to deceive and supports a strong inference of scienter.

94.     Defendants have also admitted they were aware of problems created by the 80/20 program during the Class Period.  For example, as reported by analysts at Northcoast Research, during a May 2026 virtual meeting, defendant Brazis acknowledged that Pentair's 80/20 program had "c[o]me at the cost of alienating some channel partners, particularly in Pool."  The analysts further reported that defendant Brazis acknowledged that "rejuvenating aftermarket competitive performance was key" and that "'if we lost a customer we shouldn't have, the message to the teams is go win them back.'"  These admissions demonstrate that defendants knew, or were at the very least reckless in not knowing, that Pentair's Pool business was actively losing customers at a rate that outweighed any purported benefits from the implementation of the 80/20 program, yet chose to conceal this adverse information from investors.

95.     The numerous executive departures from the Company during the Class Period – including the loss of key personnel who oversaw the 80/20 program and/or the Pool segment – further bolsters an already compelling inference of scienter.  These executive departures, which were perceived as abrupt and unexpected by the market, included: (1) defendant Brazis, CFO; (2) Jerome Pedretti, EVP and CEO of Pool; (3) Steve Pilla, Chief Transformation Officer & Chief Supply Officer; (4) Phil Rolchigo, EVP and Chief Technology Officer; (5) David Jones, Chairman of the Board; and (6) Karla Robertson EVP, Chief Sustainability Officer, General Counsel, and Secretary.  Defendant

- 35 -

Fishman also temporarily left the Company, but was forced to return as Interim CFO after the abrupt departure of Brazis. The loss of so many senior executives connected to the fraudulent scheme alleged herein bolsters an already compelling inference of scienter.

## LOSS CAUSATION

96. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Pentair ordinary shares and operated as a fraud or deceit on Class Period purchasers of Pentair ordinary shares by failing to disclose and misrepresenting the adverse facts detailed herein. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Pentair ordinary shares declined significantly as the prior artificial inflation came out of the price of the stock, as detailed herein. As result of their purchases of Pentair ordinary shares during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICATION OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

97. At all relevant times, the market for Pentair ordinary shares was an efficient market for the following reasons, among others:

(a) Pentair ordinary shares met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient, national stock market;

(b) as a regulated issuer, Pentair filed periodic public reports with the SEC;

(c)     according to the Company's Form 10-K for the 2025 fiscal year, Pentair had over 163 million ordinary shares outstanding as of December 31, 2025;

(d)     Pentair regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)     unexpected material news about Pentair was rapidly reflected in and incorporated into prices for Pentair ordinary shares during the Class Period.

98.     As a result of the foregoing, the market for Pentair ordinary shares promptly digested current information regarding Pentair from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of Pentair ordinary shares during the Class Period suffered similar injury through their purchases of Pentair ordinary shares at artificially inflated prices and a presumption of reliance applies.

99.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions.  Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them

- 37 -

important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

100. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Pentair who knew that those statements were false when made.

## COUNT I

### For Violation of §10(b) of the 1934 Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

101. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

102. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading

in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

103. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Pentair ordinary shares during the Class Period.

104. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Pentair ordinary shares. Plaintiff and the Class would not have purchased Pentair ordinary shares at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

105. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Pentair ordinary shares during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

106.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

107.    During the Class Period, defendants acted as controlling persons of Pentair within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about Pentair, the Individual Defendants had the power and ability to control the actions of Pentair and its employees.  Pentair controlled the Individual Defendants and all of its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A. Designating plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: August 12, 2026

s/ Tim Sullivan

Tim Sullivan
Bar Number 391528
TM SULLIVAN PLLC
225 South Sixth Street, Suite 3900
Minneapolis, MN 55402
Telephone: (773) 919-8667
tim@tmsull.com

Local Counsel

Brian E. Cochran
(*pro hac vice* admission forthcoming)
Francisco J. Mejia
(*pro hac vice* admission forthcoming)
ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  (619) 231-1058
Fax:  (619) 231-7423
bcochran@rgrdlaw.com
fmejia@rgrdlaw.com

Samuel H. Rudman
(*pro hac vice* admission forthcoming)
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  (631) 367-7100
Fax:  (631) 367-1173
srudman@rgrdlaw.com

Attorneys for Plaintiff

Thomas C. Michaud
(*pro hac vice* admission forthcoming)
VMT LAW, P.C.
79 Alfred Street
Detroit, MI  48201
Telephone:  (313) 578-1200
Fax:  (313) 578-1201
tmichaud@vmtlaw.com

Additional Counsel

- 42 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

City of Warren General Retirement Health, Life and Disability Benefits Plan and Trust ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below: None.

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this <u>12</u> day of August, 2026.

City of Warren General Retirement Health,
Life and Disability Benefits Plan and Trust

By: _____
Christine C. Cassani, Chairperson

PENTAIR

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Common Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 12/09/2025[R] | 1,566 | $101.86 |
| 12/10/2025[R] | 67 | $105.25 |
| 01/06/2026 | 12 | $104.47 |
| 01/30/2026 | 136 | $105.37 |
| 04/30/2026 | 314 | $80.71 |
| 06/05/2026 | 21 | $73.35 |
| 06/30/2026 | 14 | $76.66 |

Prices listed are rounded up to two decimal places.

[R]Shares that were received in.